UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DONNA MILLER, | : | CIVIL ACTION NO. |
|     Plaintiff, | : | 3:10-CV-01701 (JCH) |
| | : | |
|     v. | : | |
| | : | |
| ETHAN ALLEN GLOBAL, INC., | : | MAY 24, 2012 |
|     Defendant. | : | |
| | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 53)**

**I.   INTRODUCTION**

Plaintiff, Donna Miller, brings this suit against her former employer, Ethan Allen Global, Inc. (hereafter "EA"). Miller alleges violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e ("Title VII"), and the Connecticut Fair Employment Practices Act, § 46a-60 ("CFEPA"). Miller further alleges state common law claims of intentional infliction of emotional distress and assault and battery. EA has filed a Motion for Summary Judgment as to all of Miller's claims.

**II.   STATEMENT OF FACTS[1]**

EA is a wholly owned subsidiary of Ethan Allen Interiors, Inc. and serves as the company's international corporate headquarters. EA is located in Danbury, Connecticut. On August 30, 2006, Miller submitted an application for employment at EA. Paula Mandeville, EA's Director of Retail Services, along with others, interviewed

---

[1] Unless otherwise cited, the following facts are based upon the uncontested portions of the parties' Local Rule 56(a) Statements.

1

Miller for a customer service position. Miller accepted EA's offer of employment and commenced employment with EA on September 18, 2006, at the age of 50.

During an October 2007 performance evaluation, Miller expressed an interest in moving into a supervisory position. On January 22, 2008, she was promoted to Customer Service Representative II, and received a raise. Based on Miller's positive performance reviews and stated desire to take on a supervisory role, Mandeville twice offered Miller a promotion to a Customer Service Supervisor position; however, Miller declined both offers due to family responsibilities.

On November 4, 2008, Mandeville offered Miller a promotion to Upholstery Supervisor, which Miller accepted. At the time she offered Miller the position, Mandeville explained to Miller that the Upholstery Department was not in compliance with certain standards, and that she expected Miller to resolve those issues if she accepted the promotion. Upon acceptance of this promotion, Miller reported directly to Mandeville.

Although a raise would normally accompany this promotion, at the time Miller accepted the promotion, EA had imposed a freeze on hiring and wages. See L.R. 56(a)(2) Stmt. ¶ 34. Miller acknowledges that this freeze affected everyone who worked in Danbury. See Miller Depo. at 42. Following her promotion, Miller was responsible for supervising four Customer Service Representatives. The parties dispute whether Miller received adequate training following her promotion. See L.R. 56(a)(1) Stmt. ¶¶ 39–40; L.R. 56(a)(2) Stmt. ¶¶ 39–40.

On February 9, 2009, EA implemented a reduction in force due to the weak economy and terminated sixty-seven employees, including seven members of the

2

Customer Service Department. Specifically, EA terminated two employees from the Upholstery team, two employees from the Case Goods team, two employees from the Drop Ship team, and one employee from the Accents team. Of these seven employees, four were under the age of forty.

In 2005, Mandeville had developed standards reviews in conjunction with the Customer Service Supervisors and Representatives at that time. These reviews were generally administered on a quarterly basis, with more frequent reviews depending on the results. From approximately February 2009 through June 2009, administration of the standards reviews was temporarily stopped in order to enable all employees to adjust to the changes in workload as a result of the reduction in force. L.R. 56(a)(1) Stmt. ¶ 67; L.R. 56(a)(2) Stmt. ¶ 67.[2] In June 2009, EA reintroduced the standards reviews. L.R. 56(a)(1) Stmt. ¶ 68; L.R. 56(a)(2) Stmt. ¶ 68.[3] The Upholstery team as a whole was expected to meet a standard of at least 80% in each of the categories and sub-categories of the review. Other teams within the Customer Service Department were also expected to meet the 80% standard. Miller does not believe that the standards reviews were initially age-based; however, she believes that the way in which they were applied to her were age-based. See L.R. 56(a)(2) Stmt. ¶ 76.

On June 15, 2009, Mandeville conducted a standards review in which Miller received a 50% on her department's responses to customer emails and a 40% on her department's phone and email responses. L.R. 56(a)(1) Stmt. ¶ 78; L.R. 56(a)(2) Stmt.

---

[2] Plaintiff admits "that the standards reviews were stopped from February 2009 to June 2009." She does not cite to any evidence to support a denial or some other response to the rest of EA's assertion. See L.R. 56(a)(2) Stmt. ¶ 67. In accordance with Local Rule 56(a)(3), the court deems this fact to be admitted.

[3] See supra n. 2.

3

¶ 78.[4]  Mandeville instructed Miller to focus on processing more service requests so Miller could earn credit authority, which would enable Miller to perform the final review of service requests and issue credit.  In addition, on several occasions, Mandeville suggested that Miller take fewer phone calls from clients and delegate more responsibility to the employees she supervised.  See L.R. 56(a)(1) Stmt. ¶¶ 58–60; L.R. 56(a)(2) Stmt. ¶¶ 58–60.

On July 29, 2009, Miller received another standards review, in which the score for email responses dropped to 20%.  Miller asserts that this score was not justified.  L.R. 56(a)(2) Stmt. ¶ 86.  Mandeville informed Miller that she would perform another review in a week.  On August 6, 2009, Mandeville conducted another standards review.  As a result of this review, Mandeville issued a written warning to Miller based on her repeated failure to meet the standards reviews.  Again, Miller asserts that this discipline was not justified.  See L.R. 56(a)(2) Stmt. ¶ 96.  In addition to Miller, Mandeville also issued written warnings to other supervisors who failed to meet the minimum standards on their standards reviews.

Miller testified that on July 31, 2009, Mandeville came to her as she had her hand on the phone to make a call regarding a customer complaint, shoved her shoulder, and knocked her hand off of the phone.  See Miller Depo. at 49.  Miller testified that she explained to Mandeville that she needed to use the phone to work on the complaints.  See id.  Miller testified that Mandeville responded that she did not care, and Miller was to stay off the phone.  See id.

---

[4] See supra n. 2.

Miller also testified that she was involved in another physical altercation with a co-worker, Barbara Legendre.[5] Legendre is employed as a Merchandiser at EA. Miller testified that Legendre came to Miller's desk, slammed down a one-page email from one of Miller's employees onto Miller's desk, grabbed the back of Miller's neck, and told Miller to "tell [her] goddamn employees to stop emailing me with the same questions over and over again." See Miller Depo. at 50. Miller told Legendre to let go of her neck, which she did. See id. Miller told Mandeville about this incident, and Mandeville responded by laughing, and telling Miller to "go tell her to fuck off." See id. at 51. This type of conduct did not recur. Id. at 72. Miller did not seek medical treatment as a result of this incident, but testified that her neck was sore for a day and a half. See id. at 194–95.

On August 31, 2009, Mandeville conducted another standards review, on which Miller scored a 50% and a 40% in the areas pertaining to handling client cases.[6] Mandeville then issued Miller additional discipline, and advised that she would be terminated if her scores did not improve. See L.R. 56(a)(2) Stmt. ¶¶ 106–07. Upon receiving this review, Miller became upset, and complained to Mandeville that the standards were unattainable with the current staffing. See L.R. 56(a)(2) ¶¶ 108–09. Mandeville again stated that Miller would have to meet the minimum standards within two weeks or her employment would be terminated. See L.R. 56(a)(1) Stmt. ¶ 110; L.R.

---

[5] In her Amended Complaint, Miller alleges that this incident occurred in April 2009; however, the parties' L.R. 56(a) Statements do not provide a time period for this altercation. See Amd. Compl. ¶¶ 24, 26.

[6] See supra n. 2.

5

56(a)(2) Stmt. ¶ 110.[7]  In response, Miller informed Mandeville that she would resign instead.

After expressing her desire to resign, Miller offered to continue working for a week or two past her two weeks' notice time period, if the hiring freeze made that necessary.  See L.R. 56(a)(2) Stmt. ¶ 112.  Miller informed Mandeville that she would deliver her two weeks' notice to Mandeville the following day.  In response to Mandeville's question regarding whether Miller was sure she wanted to resign, Miller responded, "Right now, yeah, I'm sure."  See Miller Depo. at 149.

Mandeville left her office and informed Leslie Bouchard, Director of Human Resources, of the events which had occurred, and Bouchard advised Mandeville to accept Miller's resignation immediately.  Pursuant to EA's termination policy, EA expressly reserves the right to determine whether the resigning employee will be permitted to work through all or any portion of the notice period provided by the employee.  Mandeville informed Miller that, based on her discussion with Bouchard, EA would accept her resignation immediately, and told her to write a resignation letter.  See L.R. 56(a)(2) Stmt. ¶ 126–27.  Miller objected, stating that she wanted to wait until the following day to tender her resignation, but did not rescind or revoke her resignation. Miller then prepared a resignation letter.

On September 1, 2009, Miller emailed EA's Human Resources Department, and attached a letter.  The following day, Bouchard called Miller to discuss her email and letter.  EA asserts that, during their conversation, Miller confirmed that she had never made any complaints about discrimination or harassment during her employment with EA.  Miller acknowledges that she never complained to Human Resources about her

---

[7] See supra n. 2.

supervisor's conduct, her coworkers' conduct, harassment based on her age, or discrimination based on her age; however, she asserts that the Associate Handbook does not advise employees to direct such complaints to Human Resources. See L.R. 56(a)(2) Stmt. ¶¶ 144–47.

### III.   STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d

Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

**IV.    DISCUSSION**

Miller asserts that EA violated federal and state law by subjecting her to age discrimination, a hostile work environment, constructive discharge, and retaliation for protected activity. In addition, Miller alleges that EA is liable for intentional infliction of emotional distress and assault and battery.

   A.    Age Discrimination (ADEA and CFEPA)

A claim of age discrimination pursuant to the ADEA or CFEPA is considered pursuant to the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 316 (2d Cir. 1999); Craine v. Trinity Coll., 259 Conn. 625, 637, n. 6 (2002) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both."). First, the plaintiff must set forth a prima facie case by showing that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she experienced an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of discrimination. See Brennan, 192 F.3d at 316. If the plaintiff meets this burden, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action. See id. at 317. Once the defendant has asserted such a reason, the plaintiff may still prevail if she can demonstrate that age was the "but-for" cause of the challenged adverse

8

employment action.[8]  See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010).

The parties do not dispute that Miller was part of a protected class, or that she was qualified for her position.  EA instead argues that Miller was not constructively discharged, and that other conduct of which she complains does not rise to the level of an adverse employment action.[9]  See Mem. Supp. Mot. at 21–22, 24–26.  In response, Miller asserts that she was "subjected to several adverse employment actions, unfairly disciplined, denied the pay she was due, and constructively discharged."  See Mem. Opp. Mot. at 16.  Specifically, Miller alleges that she suffered the following adverse employment actions: EA refused to award her a raise in connection with her promotion; her job duties increased dramatically following the reduction in force; Mandeville disciplined Miller for taking too many phone calls, while at the same time, reprimanding her for the backlog of phone calls in her department; a camera was trained on Miller's desk; Miller was involved in physical altercations with Legendre and Mandeville; and Mandeville used the standards reviews arbitrarily and unfairly.  See Mem. Opp. Mot. at 16–18.

An adverse employment action occurs when "there is a 'materially adverse change' in the terms and conditions of employment."  See Hrisinko v. New York City

---

[8] While the Second Circuit has applied the "but-for" standard to CFEPA claims, see Timbie v. Eli Lilly & Co., 429 Fed. Appx. 20, 22 n. 1 (2d Cir. 2011), at least one Connecticut court has determined that, under the CFEPA, a plaintiff is only required to prove that age discrimination was a contributing or motivating factor, rather than a "but-for" reason for the adverse employment action.  See Wagner v. Bd. of Tr. for Connecticut State Univ., 2012 WL 669544, at *12 (Conn. Super. Jan. 30, 2012).  As the court resolves Miller's age discrimination claim without reaching this section of the standard, however, the court need not resolve this disagreement.

[9] EA also argues that several of Miller's claims are time-barred under the CFEPA.  See Mem. Supp. Mot. at 23–24.  EA offers little analysis of this assertion, and no specific details as to which claims it argues are time-barred.  See id.  As the court can resolve Miller's CFEPA claims on other grounds, it need not reach the merits of this argument.

Dep't of Educ., 369 Fed. Appx. 232, 235 (2d Cir. 2010). Such change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." See id. An adverse employment action includes such actions as termination of employment, a demotion evidenced by a decrease in wage or salary, a material loss of benefits, or significantly diminished material responsibilities. See id.

Miller fails to set forth facts to support her assertion that she suffered an adverse employment action. Miller's dissatisfaction with her job responsibilities following the reduction in force is not an adverse employment action. See Hrinsinko, 369 Fed. Appx. at 235. Similarly, the re-implementation of the standards reviews and her subsequent performance reviews is insufficient to constitute a material change in the terms and conditions of her employment. See Weeks v. New York State (Div. of Parole), 273 F.3d 76, 86 (2d Cir. 2001) ("[C]riticism of an employee . . . is not an adverse employment action."); Castro v. New York City Bd. of Educ., 1998 WL 108004, at *7 (S.D.N.Y. March 12, 1998) (no adverse employment action where plaintiff received unsatisfactory ratings, was reprimanded on one occasion, and had her performance closely monitored). While a reduction in pay may constitute an adverse employment action, Miller does not make any allegation that her pay was reduced, and she acknowledges that she did not receive a raise because a freeze on hiring and raises was implemented for everyone in the corporate building in Danbury. See Miller Depo. at 41–42. In addition, Miller acknowledges that she did not know whether the camera was actually filming her, and does not allege any way that the camera affected the conditions of her employment. See id. at 176.

Finally, the two incidents of alleged assault that Miller points to are insufficient to raise a material issue of fact with regard to an adverse employment action. "Only in limited circumstances does a single, acute incident of abuse qualify as an adverse employment action." See Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008). While Miller alleges two separate incidents, neither incident was so "extraordinarily severe" as to "alter the conditions of a working environment," as evidenced by the fact that Miller continued to work at EA in the same position and with the same responsibilities. See id. at 79 ("[P]laintiff continued to work . . . in the same position, at the same pay, and with the same responsibilities. Indeed, there is no evidence that the assault brought lasting harm to the plaintiff's ability to do his job."). Further, the two incidences involved two different people. Taking the facts in the light most favorable to Miller, she does not set forth evidence to support her allegation that she suffered an adverse employment action.[10] Consequently, she fails to set forth a prima facie case under the ADEA.

In addition, even if Miller had set forth material facts to support an adverse employment action, she does not point to any evidence which would give rise to an inference that EA discriminated against her on the basis of her age. Miller first argues that EA engaged in a pattern of discriminating against older employees. See Mem. Opp. Mot. at 19. She points to four employees whom Miller alleges were either fired, or

---

[10] For the reasons set forth below, Miller's allegation of constructive discharge is similarly insufficient to constitute an adverse employment action. See supra at Section B.2.

11

"forced out" because of their ages: Carol Rosa, Kathryn Scott, Helena Ferri,[11] and Susan Schoeffer.[12]  See Mem. Opp. Mot. at 4, 11.  The Second Circuit has cautioned against inferring discrimination on the basis of small sample sizes.  See Pollis v. New School for Soc. Research, 132 F.3d 115, 121 (2d Cir. 1997).  It is uncontested that EA employs approximately 237 people.  Given such a small sample size, Miller cannot rely on these four cases to draw an inference of discrimination.  See id.

Further, Miller does not point to any evidence, other than her own speculation, to support her assertions that any of these people were terminated because of their age. See Miller Depo. at 180–85.  Miller acknowledges that both Ferrar and Schoeffer left on their own accord, and that neither made any reference to harassment on the basis of their age.  See id.  This evidence is insufficient to raise a material issue of fact in support of the assertion that EA engaged in a pattern of discrimination on the basis of age.  See Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996) "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment.").

Finally, her assertion that the circumstances give rise to an inference of discrimination is undercut by the undisputed fact that Mandeville not only hired Miller at the age of fifty, but also promoted her at the age of fifty-two, less than a year before the incidents of which Miller complains occurred.  See Schnabel v. Abramson, 232 F.3d 83,

---

[11] In her Amended Complaint, Miller refers to Helene Ferrar.  See Amd. Compl. ¶ 16.  In her Memorandum in Opposition, Miller refers to Helena Ferri.  See Mem. Opp. Mot. at 11.  Miller's deposition transcript refers to Helena Ferrar.  See Miller Depo. at 180.  The court presumes these all refer to the same individual, and any inconsistency with regard to the individual's name is the result of typographical error.

[12] In her Amended Complaint, Miller also referred to Stuart Brown, alleged to be approximately sixty-five years old when he was terminated, and Beth Kennedy, alleged to be over sixty-five years old when she was terminated.  See Amd. Compl. ¶¶ 13, 15.  Miller later acknowledged that, in fact, both Kennedy and Brown were in their mid-twenties.  See Miller Depo. at 173, 180.

91 (2d Cir. 2000) ("[W]here the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire. We conclude that this remains a highly relevant factor in adjudication a motion for summary judgment on an ADEA claim."). Consequently, EA is entitled to summary judgment with regard to Miller's age discrimination claims.

    B.    <u>Other ADEA and CFEPA Claims</u>

Miller also alleges that she was subjected to a hostile work environment, constructive discharge, and retaliation, in violation of the ADEA and the CFEPA.[13]

        1.    Hostile Work Environment

A hostile work environment, in violation of the ADEA and the CFEPA, occurs where "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." See Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003). A plaintiff must demonstrate that the incidents were either "sufficiently continuous and concerted to be considered pervasive, or that a single episode is severe enough to establish a hostile working environment." See Brennan, 192 F.3d 310, 318 (2d Cir. 1999). Additionally, a plaintiff must show that she was subjected to this hostility because of her membership in a protected class, as an environment which is equally harsh for both young and old is not protected by the civil

---

[13] EA argues that it is entitled to summary judgment as to Miller's sex discrimination claims because Miller has withdrawn any such claims. See Mem. Supp. Mot. at 15. The court has reviewed the Amended Complaint and cannot ascertain where Miller raises a claim of sex discrimination in violation of Title VII or the CFEPA. However, to the extent such a claim exists, EA is entitled to summary judgment, as plaintiff's 56(a)(2) Statement confirms that she is not pursuing a claim of sex discrimination. See L.R. 56(a)(1) Stmt. ¶ 154; L.R. 56(a)(2) Stmt. ¶ 154.

rights statutes. See id. "Isolated, minor acts or occasional episodes do not warrant relief." Id.

Miller argues that she was subjected to a hostile work environment in a variety of ways. First, she asserts that EA engaged in a pattern of discriminating against older employees. See Mem. Opp. Mot. at 23–24. Additionally, Miller argues that EA "singled her out for additional duties and responsibilities, but denied her the additional pay she was entitled to;" "put her in situations where it was impossible for [her] to succeed;" that she was physically assaulted by Legendre and Mandeville; and that she was discriminated against through the standards reviews. See id. at 24–25.

The court has already addressed Miller's failure to submit evidence from which a reasonable jury could infer a pattern of discrimination. See supra Section IV.A. With regard to Miller's other allegations, for the same reasons set forth above with regard to Miller's age discrimination claim, these incidents were not significant enough to alter the conditions of Miller's employment, even considering them cumulatively. Consequently, EA is entitled to summary judgment as to Miller's hostile work environment claim.

        2.      Constructive Discharge

To establish constructive discharge, a plaintiff must show that the employer "deliberately made [her] working conditions so intolerable that [she was] forced into an involuntary resignation." See Stetson v. Nynex Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993). The standard for constructive discharge is "demanding," and generally will not be met simply by showing that the employee was dissatisfied with the nature of her assignments, or that her working conditions were difficult or unpleasant. See id.; Miller v. Praxair, Inc., 2009 U.S. Dist. LEXIS 51130, *17 (D. Conn. June 18, 2009). A

constructive discharge claim "must entail something more than what is required for . . . [a] hostile-environment claim." See id. Miller relies on the same evidence to support her constructive discharge claim as she set forth with regard to her hostile work environment claim. See Mem. Opp. Mot. at 22–26. As Miller fails to set forth adequate evidence to avoid summary judgment with regard to her hostile work environment claim, her constructive discharge claim must fail as well.[14]

        3.     Retaliation

Finally, EA asserts that it is entitled to summary judgment as to Miller's retaliation claim because Miller cannot demonstrate that she engaged in protected activity or that a causal connection exists between any protected activity and an adverse action. See Mem. Supp. Mot. at 33–34. Miller alleges that Mandeville retaliated against her after Miller complained to Mandeville about the physical altercation with Legendre and objected to Mandeville's instruction to violate EA's standards. See Mem. Opp. Mot. at 29–30.

"To establish a prima facie case for retaliation, a plaintiff must demonstrate participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action." See Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) (internal quotations omitted). To engage in protected activity, an individual must protest or oppose statutorily prohibited discrimination. See id. A plaintiff must demonstrate "that a reasonable employee would have found the challenged action materially adverse," in that it would "dissuade[] a

---

[14] Further, the fact that Miller volunteered to continue working beyond her two week notice period undercuts her assertion that the workplace conditions were so intolerable that a reasonable person would have felt compelled to resign. See Franco v. Yale Univ., 80 Fed. Appx. 707, 709 (2d Cir. 2003).

reasonable worker from making or supporting a charge of discrimination." See Burlington North. v. White, 548 U.S. 53, 68 (2006).

Miller asserts that she engaged in protected activity when she complained to Mandeville about her physical altercation with Legendre and when she protested Mandeville's instruction to violate EA's standards by refusing to replace a defective sofa which had been sold to a client. See Mem. Opp. Mot. at 29–30. First, Miller's confrontation with Mandeville regarding EA's standards does not constitute protected activity because Miller was not protesting any "statutorily prohibited discrimination." See Cruz, 202 F.3d at 566. With regard to Miller's complaint to Mandeville regarding her altercation with Legendre, Miller testified that she "told Paula that Barbara had just grabbed the back of my neck, screamed at my employee loud enough for the other two departments to hear and Paula started laughing and said go tell her to fuck off and that was Paula's answer." Miller Depo. at 51. Further, Miller testified that she had no evidence that this incident was based upon her age. See id. at 79–80. On the basis of this evidence, it would not be reasonable for a jury to conclude that Miller's complaint to Mandeville was protected activity, because there is no evidence that Miller was complaining about discrimination or harassment because of her age. See Cruz, 202 F.3d at 566. Consequently, Miller has not raised a material issue of fact to support her claim that she engaged in protected activity, and EA is entitled to summary judgment as to Miller's retaliation claim.

C.     Miller's Remaining Claims

Having granted summary judgment in favor of EA on Miller's federal claims,[15] the court declines to exercise supplemental jurisdiction over Miller's state common law claims of intentional infliction of emotional distress and assault and battery.  Under 28 U.S.C. § 1367(c)(3), "[t]he district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  When a plaintiff's federal claim is dismissed before trial, the basis for retaining jurisdiction is weak.  See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).  Accordingly, the court declines to exercise jurisdiction over the state law claims in Counts Three and Five, and those claims are dismissed.  See Egbarin v. Lewis, Lewis, & Ferraro, LLC, 2006 WL 236846, at *11 (D.Conn. Jan. 31, 2006).

**V.     CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment (Doc. No. 53) is **granted**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 24th day of May, 2012.

                                                /s/ Janet C. Hall
                                                Janet C. Hall
                                                United States District Judge

---

[15] As the analysis of Miller's CFEPA mirrors the ADEA analysis, summary judgment is also appropriate with regard to Miller's CFEPA claim.